# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case Nos. 07-C-3750 and |
| AUTOMOTIVE PROFESSIONALS, INC., | ) | 07-C-4152 |
| | ) | |
| Debtor. | ) | Judge Joan H. Lefkow |
| | ) | |

## MEMORANDUM DECISION

Automotive Professionals, Inc. ("API") filed a petition for chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Northern District of Illinois in May of this year. The case was assigned to Judge Carol Doyle with case number 07-B-06720. The State of Illinois ("the State") through its Director of Insurance, Michael T. McRaith ("the Director"), filed a motion to dismiss the case, which the bankruptcy court denied in a memorandum opinion issued on June 12, 2007. On July 3, 2007, the court granted API's motion to compel the Director, in his capacity as conservator of API's assets, to turn over any property of the estate in his possession and entered an order to that effect.

The State has now moved for leave to appeal the orders of June 12 and July 3 to this court. Those motions have been assigned case numbers 07-C-3750 and 07-C-4152, respectively. This court has jurisdiction to hear the motions under 28 U.S.C. § 1334(b) and 28 U.S.C. § 158(a). For the following reasons, both motions [#1 in case no. 07-C-3750 and #1 in case no. 07-C-4152] are denied and these cases will be terminated.

I.    **Facts and Background**[1]

API is an Illinois corporation based in Schaumburg, Illinois. It sells vehicle service contracts to owners of vehicles. The purchaser pays API a fixed amount and API agrees to pay for the cost of certain vehicle repairs for a fixed period of time after the expiration of the original manufacturer's warranty. API's vehicle service contracts are sold through automobile dealerships.

API has outstanding vehicle service contracts with approximately 325,000 consumers in 49 states, including approximately 16,250 consumers in Illinois. API has been registered with the [Director] as an authorized service contract provider under the Illinois Service Contract Act ("[the] Act"), 215 Ill. Comp. Stat. 152/1 *et seq.* (2006), since at least 2002. Each year the State has approved API's contract forms.

Most states have their own version of the Act, usually based at least to some degree on the Service Contracts Model Act. These laws generally require a service contract provider to demonstrate its financial ability to perform the contracts either through insurance, reserves, or some other means. API's vehicle service contracts are backed by a combination of funds on deposit in various reserve accounts and insurance policies. The amount and type of insurance coverage or other financial backing for each of API's vehicle service contracts is based on the law of the state in which the vehicle service contract is sold.

If a company selling service contracts in Illinois satisfies the financial requirements of the Act through an insurance policy, the policy must provide "first dollar coverage" - meaning that it covers any liability that the service contract provider has under the service contract with the customer. All of API's vehicle service contracts sold in Illinois are backed by first dollar coverage issued by Marathon Financial Insurance Co., Inc. ("Marathon"), Allstate Insurance Company or Travelers Insurance Company. Marathon also provides less comprehensive coverage for many of API's vehicle service contracts sold in states that do not require first dollar coverage.

For the last three years, API has operated at a cash deficit. There is now a cash shortfall of approximately $9 million in the reserve accounts relating to some of the vehicle service contracts. API's situation is complicated by provisions of the Marathon insurance policies that apply to vehicle service contracts sold in states that do not require first dollar coverage. Marathon contends that its coverage does not attach to cover claims until all funds placed in API's reserve accounts in

---

[1] The bankruptcy court noted that these facts were undisputed. Regardless of whether or not they were disputed by the parties at the time, this court is bound to accept the bankruptcy court's findings of fact unless it finds them to be clearly erroneous. Fed. R. Bankr. P. 8013.

the aggregate have been paid out for repair costs. Marathon may also assert that it has no obligation to pay on the non-first dollar policies for other reasons.

In the fall of 2006, API's management determined that it could not fix its financial problems and that it should wind down its operations. API executed an assignment of its assets for the benefit of creditors on February 15, 2007. The assignee is Michael Kayman. API's assets were transferred to the API Creditors Trust administered by Mr. Kayman for the purpose of liquidating the assets and paying out the proceeds to creditors.

On March 2, 2007, Michael McRaith, the Illinois Director of Insurance, filed a complaint against API and the API Creditors' Trust in the Circuit Court of Cook County. He obtained an Order of Conservation and Injunctive Relief ("order of conservation"), effectively freezing Kayman's activities as API's assignee. The complaint was brought in part under the Act. On April 4, 2007, McRaith filed a Complaint for Rehabilitation in state court seeking to "rehabilitate, wind down and terminate" the business and affairs of API under the rehabilitation and liquidation provisions of the Illinois Insurance Code. There has been no adjudication of any issues in connection with this second complaint.

API filed its bankruptcy petition [on April 13, 2007]. The State filed its motion arguing that the case should be dismissed and the Director should be permitted to liquidate API under the rehabilitation and liquidation provisions of the Illinois Insurance Code [on April 27, 2007].

State's Motion for Leave to Appeal, Case No. 07-C-3750, Dkt. No. 1 ("State's motion"), Ex. B

(memorandum opinion denying motion to dismiss), at 2-4. On June 12, 2007, the bankruptcy

court denied the motion. *See id.* In the meantime, on June 8, 2007, the court granted the motion

of various creditors for appointment of a chapter 11 trustee. Frances Gecker was appointed as

trustee. On July 3, 2007, the bankruptcy court granted API's motion to compel the Director to

turn over any property of API's estate in his possession and entered an order to that effect.

The State's principal ground for its motion to dismiss was its argument that API is not

eligible to be a debtor under the bankruptcy code because API is a "domestic insurance

company" and domestic insurance companies are excluded from bankruptcy relief under section

109(b)(2) and (d) of the code, 11 U.S.C. § 109(b)(2) and (d). State's motion, Ex. B, at 4. The

3

bankruptcy court rejected this argument and found that API is not an insurance company for purposes of section 109. *See id.* at 4-29. The court also rejected API's other arguments: (2) sovereign immunity protects the Director from having to turn over API's assets; (3) the bankruptcy code's automatic stay does not apply to an action filed by the Director in state court to liquidate API under the rehabilitation and liquidation provisions of the Illinois Insurance Code; (4) API's officers lacked authority to file the bankruptcy petition because a state court appointed the Director as conservator of API's assets before it filed its bankruptcy petition; and (5) API has no assets to administer in bankruptcy because of a prepetition assignment for the benefit of creditors. *Id.* at 29-38. Three of those arguments were repeated by the State and again rejected by the court in the course of API's motion to compel. State's Motion for Leave to Appeal, Case No. 07-C-4152, Dkt. No. 1 ("State's second motion"), Ex. B (memorandum opinion granting API's motion to compel), at 4.

II.    **Standard of Review**

Under 28 U.S.C. § 158(a)(3), parties to a bankruptcy proceeding can ask leave of the district court to appeal an interlocutory order issued by the bankruptcy court.[2] This is not an appeal of right, however, and it is within the district court's discretion to decide whether or not

---

[2] The text of the statute is as follows:

(a) The district courts of the United States shall have jurisdiction to hear appeals

　　(1) from final judgments, orders, and decrees;
　　(2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
　　(3) *with leave of the court, from other interlocutory orders and decrees....*

28 U.S.C. § 158(a) (emphasis added).

4

to allow the appeal. *In re Woltman*, 2006 WL 2052078, at *1 (C.D. Ill. May 24, 2006) (citing *In re Jartran, Inc.*, 886 F.2d 859, 866 (7th Cir. 1989)); *see also In re Nat'l Steel Corp.*, 2005 WL 2171169, at *3 (N.D. Ill. Aug. 31, 2005). The bankruptcy code does not provide the standard for evaluating such requests, so courts in this district have imported the three part test used in analyzing interlocutory appeals from a district court to a circuit court of appeals under 28 U.S.C. § 1292(b): an appeal is allowable when it (1) involves a controlling question of law; (2) over which there is substantial ground for difference of opinion; and (3) an immediate appeal from the order may speed up the litigation. *See* 28 U.S.C. § 1292(b); *Trustee of Jartran, Inc.* v. *Winston & Strawn*, 208 B.R. 898, 900 (N.D. Ill. 1997). The party seeking leave to appeal should demonstrate that all three factors are satisfied. *Woltman*, 2006 WL 2052078, at *1 (citing *Hollinger Int'l, Inc.* v. *Hollinger Inc.*, 2005 WL 327058, at *2 (N.D. Ill. Feb. 3, 2005)). He also bears the burden of convincing the court that his case involves "exceptional circumstances [that] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Woltman*, 2006 WL 2052078, at *1 (quoting *In re Brand Name Prescription Drugs Antitrust Litig.*, 1998 WL 808992, at *3 (N.D. Ill. Nov. 17, 1998)).

## III.    Analysis

The Director characterizes its questions presented for appeal, which are substantially the same as the grounds it asserted for its motions in the bankruptcy court, as follows:

1. Does Illinois classify API as an insurance company or the substantial equivalent of an insurance company such that API cannot be a debtor under section 109(b)(2) of the Bankruptcy Code and was it proper to ignore the Circuit Court's final determination granting the Director leave to seek an order of rehabilitation?

5

2. Is the Director entitled to Sovereign Immunity as per the Eleventh Amendment of United States' Constitution under the facts of this case?
3. Does the Bankruptcy Code's Automatic Stay apply to prevent the State of Illinois from exercising its constitutionally reserved regulatory and police powers?
4. Could API's officers and directors ignore the Circuit Court of Cook County's explicit conservation order divesting of the ability to take actions on behalf of API without permission from the Director?
5. Did the Bankruptcy Court properly strike a section of the Director's Reply Brief in Support of its Motion to Dismiss addressing abstention?

State's motion, at 5; State's second motion, at 5 (raising only numbers 1, 2, and 3, but with substantially the same arguments in support). The court will address all of these arguments in the course of this memorandum.

### A.    API's eligibility for bankruptcy relief

Section 109(b) of the bankruptcy code provides that "[a] person may be a debtor under chapter 7 of this title only if such person is not ... (2) a domestic insurance company ...." 11 U.S.C. § 109(b). Section 109(d) in turn provides that "[o]nly ... a person that may be a debtor under chapter 7 of this title ... may be a debtor under chapter 11 of this title." 11 U.S.C. § 109(d). The bankruptcy court identified the appropriate test for determining whether an entity is an insurance company for purposes of section 109. That is the "state classification test" set out by the Seventh Circuit in *In re Estate of Medcare HMO*, 998 F.2d 436, 442 (7th Cir. 1993): "the classification of an entity should generally follow the law of the state of its incorporation, so long as that classification does not frustrate the purposes of the Code." In practice, this means first determining whether state law classifies the entity as an insurance company and second, whether the entity can alternatively be considered to be substantially equivalent to an insurance company. *Id.* at 442-45. Finally, the court examines whether the resulting classification is consistent with the policy behind the bankruptcy code. *Id.* at 446-47.

6

The Seventh Circuit has explained, and it is relevant to note here, that the purpose behind excluding domestic insurance companies from federal bankruptcy protection is that they are already subject to a comprehensive scheme of state regulation. *Medcare HMO*, 998 F.2d at 441. "Indeed, Congress has codified its policy of leaving the regulation of the 'business of insurance' to the states in the McCarran-Ferguson Act, 15 U.S.C. § 1011-15." *Id.* The bankruptcy court doubtless had this in mind when it undertook its thoughtful and comprehensive analysis of whether service contract providers are insurance companies under Illinois law.

The Service Contract Act ("the Act") was enacted in 1998 with the apparent purpose of providing some protections to consumers of service contracts. *See* 215 Ill. Comp. Stat. 152 *et seq.* The bankruptcy court looked to the Act to determine how service contract providers are categorized under Illinois law. The court found two sections of the relatively brief Act to be most relevant to its analysis. The first was the definition of a service contract provider, found in section five of the Act: "'Service contract provider' means a person who is contractually obligated to the service contract holder under the terms of the service contract. *A service contract provider does not include an insurer*." 215 Ill. Comp. Stat. 152/5 (emphasis added).[3] The second was the following exemption in section ten: "Service contract providers and related service contract sellers and administrators complying with this Act are not required to comply

---

[3] The Act defines a "Service Contract" as "a contract or agreement whereby a service contract provider undertakes for a specified period of time, for separate and identifiable consideration, to perform the repair, replacement, or maintenance, or indemnification for such services, of any automobile, system, or consumer product in connection with the operational or structural failure due to a defect in materials or workmanship, or normal wear and tear, with or without additional provision for incidental payment or indemnity under limited circumstances, for related expenses, including, but not limited to, towing, rental, and emergency road service. Service contracts may provide for the repair, replacement, or maintenance of such property for damage resulting from power surges and accidental damage from handling. Service contracts shall not include contracts of limited duration that provide for scheduled maintenance only." 215 Ill. Comp. Stat. 152/5

with and are not subject to any provision of the Illinois Insurance Code." 215 Ill. Comp. Stat. 152/10.

API argued in the bankruptcy court that the definition of a service contract provider in section five precludes a service contract provider from ever being treated as an insurer under Illinois law. The State took a similarly absolute position by arguing that under section ten, any failure to comply with any provision of the Act would render a service contract provider immediately subject to the entire Illinois Insurance Code. The bankruptcy court, after carefully examining the Act as a whole as well as its context and legislative history, found that the most reasonable interpretation was something in between those extremes, as follows:

> Read as a whole, [the provisions of the Act] create a statutory scheme under which service contract providers who meet the financial and registration requirements of §§ 15 and 25 are exempt from the Insurance Code but must comply with the specific requirements of the Act regarding their obligations to consumers. If they violate th[ose] specific provisions relating to service contracts (§§ 20, 30, 35, 40, or 45), the Director of Insurance may use the array of enforcement powers provided in § 50 to force compliance but they do not lose their exemption.
>
> ***
>
> [Sections 10 and 15] provide the ground rules for selling service contracts in Illinois. They create three alternatives for service contract providers to demonstrate the financial ability to perform their contracts that would justify the exemption from the Insurance Code provided in § 10. Complying with one of these three alternatives would satisfy the legislature's apparent desire to protect consumers from service contract providers who do not have the financial ability to perform without requiring the providers to comply with the extensive regulatory system imposed on insurance companies. While this interpretation leaves open the question of what was intended by the exclusion of insurers from the definition of a service contract provider in § 5, that oddly phrased exception to a definition must give way to the clear implication of § 10 that providers must comply with the Act to be exempt from the Insurance Code.

State's motion, Ex. B, at 7-9.

8

In its motion for leave to appeal, the State does not contest the bankruptcy court's conclusion that service contract providers who comply with sections 10 and 15 of the Act are not required to comply with and are not subject to any provision of the Illinois Insurance Code. Instead, it argues generally that "Illinois may not have required API to comply with the rules that traditionally govern insurers ... but it has *always 'classified'* companies such as API as insurance companies. There is no need for an exemption if API was not otherwise classified as an insurance company." State's motion, at 9 (emphasis in original). In support of this, it cites *Griffin Sys., Inc.* v. *Washburn*, 505 N.E.2d 1121, 1123-25, 153 Ill. App. 3d 113, 115-19 (Ill. App. Ct. 1st Dist. 1987), in which the Illinois Appellate Court found that a service contract similar to those sold by API was in fact "insurance" and that the company selling it was subject to the rules and regulations of the Illinois Department of Insurance.

Keeping the requirements for granting leave to appeal in mind, the court first notes that "[w]hether an entity is excluded from the protection of the Bankruptcy Code is a question of law," *Medcare HMO*, 998 F.2d at 438, and therefore the first requirement is fulfilled. With regard to the second requirement, however, the State has not shown that there is substantial ground to disagree over whether API should be classified as an insurance company and deprived of the right to seek protection as a debtor under the bankruptcy code. *Griffin* was decided in 1987, eleven years before the Act became law. In light of the Act's definition of a service contract provider as not including an insurer, *Griffin*'s holding to the contrary has been called into question at the very least. Furthermore, the State's argument that whether an entity is required to comply with the Illinois Insurance Code is not determinative of whether it is an insurer is not persuasive because its result would conflict with the purpose of the bankruptcy

9

code.  As referenced above, the purpose behind section 109's exclusion of insurance companies

from bankruptcy relief is the recognition that states have comprehensive systems for regulating

those companies.  Here, classifying API as an "insurer" and holding it ineligible to seek

bankruptcy relief does not achieve section 109's purpose because API is exempted from Illinois's

comprehensive regulation of insurance companies and therefore there is no substitute for the

availability of federal bankruptcy relief.[4]

Next, the State argues that API has not complied with the financial requirements in

section 15 of the Act and that API is therefore ineligible for the exemption from the Illinois

Insurance Code.  It cites the language of section 15: "No service contract shall be *issued, sold, or*

*offered for sale in this State* unless one of the following conditions are satisfied ...." 215 Ill.

Comp. Stat. 152/15 (emphasis added).  Those conditions require the service contract provider to

either (1) be insured with "first dollar coverage" under a service contract reimbursement

insurance policy issued by an insurer authorized to do business in Illinois; (2) maintain a funded

reserve account for its obligations under service contracts issued and outstanding in Illinois,

which shall not be less than 40% of the gross consideration received less claims paid for all

service contracts sold and then in force; or (3) maintain a net worth or stockholders' equity of

$100 million.  215 Ill. Comp. Stat. 152/15(1)-(3).  API chose the first option: to obtain a service

contract reimbursement insurance policy with first dollar coverage under section 15(1)(A).  API

does not have "first dollar coverage" for all contracts that API sold anywhere in the world, but

only for those sold in Illinois and the six other states that require first dollar coverage.  Because

---

[4] The court notes that although this appears to be a question of first impression in this district, that status is
insufficient by itself to satisfy the interlocutory appeal requirement of contestability. *In re Demert & Dougherty,*
*Inc.*, 2001 WL 1539063, at *6 (N.D. Ill. Nov. 30, 2001).

API is headquartered in Illinois, the State contends that API "issued" every policy in Illinois and that section 15(1)(A) therefore requires it to have first dollar coverage for every policy.

The bankruptcy court fully addressed this argument, devoting over eight pages to its specific treatment. After recognizing that "issued" is not defined in the Act and that Illinois courts have not yet construed it, the court first considered the use of the word in other contexts in cases from Illinois, other states, and the Seventh Circuit. Finding varying definitions, it next attempted to deduce the meaning that the Illinois legislature intended by examining other provisions of the Act and the Act as a whole. The court found that several provisions demonstrate that the Act was intended only to protect contract purchasers in Illinois and was not intended to apply to contracts sold outside of Illinois. For example, section 50 (the enforcement provision) contains language limiting its application to protecting contract purchasers in Illinois: the Director [of Insurance] may conduct examinations "to enforce this Act and protect service contract holders *in this State*." State's motion, Ex. B, at 14 (citing 215 Ill. Comp. Stat. 152/50(a) (emphasis added by the bankruptcy court)); *see also* 215 Ill. Comp. Stat. 152/50(b); 215 Ill. Comp. Stat. 152/25(a)(4) (requiring service contract providers to submit for approval copies of contracts "to be sold in this State").

The court also looked to the legislative history. The Illinois legislature was aware that service contract laws were being enacted in states across the nation, and that many of those states did not choose to require first dollar insurance coverage. Interpreting the Act to apply to all service contracts issued by any Illinois-based company would therefore directly conflict with other states' intentions for contracts sold within their jurisdictions. Next, the court noted that the legislature used language from the Service Contracts Model Act, including the introductory

11

words "issued, sold, or offered for sale in this state." Other provisions of the Model Act make clear that its drafters intended it to apply only to contracts sold within each state. Furthermore, the wording and structure of API's contracts are consistent with this limited interpretation: the contracts contain a list of itemized changes to their language dictated by the requirements of each state in which they are sold. The Illinois Director of Insurance has approved these contracts (as well as the insurance policies backing the contracts) every year since 2002.

The bankruptcy court concluded that the Act "was intended to apply only to service contracts sold or issued to persons located in Illinois.... [The court therefore rejected] the State's contention that API must have first dollar reimbursement insurance coverage for every contract it sells to anyone located anywhere to comply with the financial requirements of § 15(1)(A)." State's motion, Ex. B, at 18.

The State makes several arguments against the bankruptcy court's conclusion, such as that (1) the court erred by considering case law from other states; (2) requiring first dollar coverage for all contracts issued by API actually *would* protect service contract holders in this state because it would make API financially stronger as a whole; (3) it's not unusual for state laws to affect domiciled corporations differently; and (4) Illinois modified the Model Act in some respects, which shows that it intended to depart from it. Additionally, the State argues that the bankruptcy court failed to consider the "offered for sale" term and focused only on the word "issued." These arguments are not persuasive for several reasons, the most important being that they do not refute the overwhelming evidence that supports the bankruptcy court's decision. The State has therefore not shown that there is a substantial ground for a difference of opinion with that decision.

12

The State also argues that the bankruptcy court should have found API to be the substantial equivalent of an insurance company under the analysis set forth in *Medcare HMO*, 998 F.2d at 444-46, and *In re Cash Currency Exchange, Inc.*, 762 F.2d 542, 548 (7th Cir. 1985). For this inquiry, the most important factor is whether an entity shares an "essential attribute" with insurance companies, but courts must also look to other factors, including the "degree of state regulation of the entity involved, the existence of a state statutory scheme for liquidation or rehabilitation and the public or quasi-public nature of the business." *Medcare HMO*, 998 F.2d at 444-45 (citing *Cash Currency*, 762 F.2d at 548). The bankruptcy court considered that API potentially shares an "essential attribute" with insurance companies because it assumes the risk of a third party for a premium; however, all of the other factors weighed against categorizing it as the substantial equivalent of an insurance company.

The State contends that because API shares an essential attribute with insurance companies, this court should hold that to be sufficient for it to be the substantial equivalent of an insurance company. But that would disregard the other factors that the Seventh Circuit has instructed lower courts to consider. Those considerations are intended to ensure that the courts' holdings are consistent with the purpose behind the bankruptcy code. As discussed above, the bankruptcy code exempts insurance companies because they are already highly regulated by the states. Consideration of the degree of state regulation is therefore necessary to ensure that only entities that are similarly treated under state law are exempted as "substantial equivalents." *Medcare HMO,* 998 F.2d at 446 ("The more extensively an entity is regulated under state law, the stronger the state interest and the more likely it is that Congress intended to exclude the entity from bankruptcy relief and leave to the states the business of winding up."); *Cash*

*Currency*, 762 F.2d at 551 ("The more comprehensive the liquidation scheme, the stronger the indication that the state sees a strong public interest in direct governmental supervision and control of the liquidation or dissolution of the institution."). Here, the degree of state regulation of service contract providers is not comparable to the Illinois Insurance Code, and as has already been discussed, there is no state scheme for liquidating or rehabilitating service contract providers that comply with the Act. Because these factors weigh strongly against API being the substantial equivalent of an insurer, the bankruptcy court's conclusion that it is not substantially equivalent is not contestable.

The State has one final ground for arguing that API should be classified as an insurance company under Illinois law, which is that API must not have had first dollar insurance coverage even for the service contracts that it sold to Illinois residents, because if it had, then surely Marathon Insurance Company would be paying Illinois customers' claims and API would not be bankrupt. This is a factual issue, so this court is bound to accept the bankruptcy court's findings unless they are clearly erroneous. The bankruptcy court explicitly held that "it is undisputed that API has first dollar coverage for all service contracts sold in Illinois." State's motion, Ex. B, at 10; *see also id.* at 11. Because there is no evidence to the contrary other than API's bankruptcy, the court cannot hold this conclusion to be clearly erroneous.

### B.    The effect of the circuit court's order of conservation

The State argues in two different ways that the circuit court's order of conservation precludes API from seeking federal bankruptcy relief. Neither is persuasive. First, the state argues (as it did before the bankruptcy court) that API's directors did not have the power to file the bankruptcy petition because the *ex parte* order of conservation entered by the circuit court

placed the Director in control of API's assets and business, including the right to file for

bankruptcy protection. This argument was considered and rejected by the bankruptcy court

because it goes against the controlling precedent of *Cash Currency*, in which the Seventh Circuit

held that entities that had been placed in administrative receivership and against whom the

Illinois Director of Financial Institutions had initiated liquidation proceedings could still file for

bankruptcy protection. 762 F.2d at 552-53. It said, "the exclusivity of an administrative

receiver's title to all assets under state law is irrelevant to the determination whether a particular

entity may file for bankruptcy relief.... Title 11 suspends the operation of state insolvency laws

except as to those classes of persons specifically excluded from being debtors under the Code."

*Id.* Because the bankruptcy court held that API is not specifically excluded from being a debtor

under section 109, the order of conservation does not preclude API from filing for bankruptcy.

Finally, the State raises the *Rooker-Feldman* doctrine and argues that the circuit court's

order of conservation was a final determination that API is classified as an insurance company, is

subject to rehabilitation and liquidation proceedings in state court, and is therefore ineligible for

bankruptcy relief. That order was not a final judgment for the purposes of the *Rooker-Feldman*

doctrine, however, so the doctrine does not operate in this case to bar API's bankruptcy petition.

"*Rooker* and *Feldman* exhibit the limited circumstances in which th[e Supreme] Court's appellate

jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States district court

from exercising subject-matter jurisdiction in an action it would otherwise be empowered to

adjudicate under a congressional grant of authority.... In both cases, the losing party in state

court filed suit in federal court after the state proceedings ended, complaining of an injury caused

by the state-court judgment and seeking review and rejection of that judgment." *Exxon Mobil*

*Corp.* v. *Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005). The state proceedings here have not ended; the Director's complaint for rehabilitation remains pending before the state court. The *Rooker-Feldman* doctrine therefore does not apply.

### C.    The applicability of sovereign immunity and the automatic stay

The bankruptcy court rejected the State's argument that sovereign immunity protects it from being required to return assets under its control to API, citing, *inter alia*, *Central Va. Community College* v. *Katz*, 546 U.S. 356, 378, 126 S. Ct. 990, 1005, 163 L. Ed. 2d 945 (2006) for the proposition that states have no sovereign immunity with respect to issues relating to turnover of property of the estate. The court separately held that the police and regulatory powers exception (in section 362(b)(4) of the bankruptcy code) to the automatic stay does not apply to the state's attempt to liquidate API because that cannot be characterized as an exercise of Illinois's police and regulatory powers.

Here, the State contends both that sovereign immunity *does* apply and that the automatic stay *does not* because it is exercising its regulatory powers, as permitted under *Village of Rosemont* v. *Jaffe*, 482 F.3d 926 (7th Cir. 2007)[5] and section 362(b)(4). Both of its arguments can therefore be resolved by determining whether the State's liquidation efforts qualify as an exercise of its police and regulatory powers.

The State contends that the bankruptcy court concluded "without any authority" that the Director is not enforcing laws intended to protect the health, welfare, or safety of the public, and

---

[5] In *Village of Rosemont*, the court held that the Illinois Gaming Board had not waived its sovereign immunity in the bankruptcy court by pursuing gambling license revocation proceedings against the casino, which was also a debtor in bankruptcy court, because those proceedings were a proper exercise of the Board's police and regulatory powers. 482 F.3d at 936-37.

that therefore the section 362(b)(4) exception to the automatic stay does not apply. On the

contrary, the bankruptcy court's analysis was both well reasoned and well supported:

> [T]he State's interpretation of § 362(b)(4) goes well beyond the limits of this
> exception. Interpreting § 362(b)(4) to permit a state to conduct parallel
> liquidation proceedings would defeat the fundamental purpose of the Bankruptcy
> Code. "[F]ederal bankruptcy law in general, and the automatic stay in particular,
> exist in part to centralize the process of distributing the debtor's estate among its
> creditors." *In re Emerald Casino, Inc.*, 2003 WL 23147946, at *9 (N.D. Ill. Dec.
> 24, 2003), *aff'd sub nom., Village of Rosemont* v. *Jaffe*[], 482 F.3d 926 (7th Cir.
> 2007). "The purpose of the automatic stay is to preserve what remains of the
> debtor's insolvent estate and to provide a systematic equitable liquidation
> procedure for all creditors." *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir. 1982).
> Nothing in § 362(b)(4) evidences a Congressional intent to permit a parallel state
> court liquidation to proceed under the guise of a state's regulatory power.

> The term "regulatory power" is not defined in the Bankruptcy Code. However,
> "the statute's legislative history states that § 362(b)(4) includes a governmental
> unit's suits against a debtor 'to prevent or stop violation of fraud, environmental
> protection, consumer protection, safety, or similar police or regulatory laws.'" *In
> re Phillips*, 2007 WL 1264027, at *5 (Bankr. N.D. Ind. March 27, 2007) (citing
> H.R. Rep. No. 595, 95th Cong., 1st Sess. 343 (1977)); *In re Herrera*, 194 B.R. 178,
> 184-85 (Bankr. N.D. Ill. 1996).

> The Seventh Circuit addressed this issue in *Cash Currency*, 762 F.2d at 554-55.
> The court held that an action filed by the Illinois Director of Financial Institutions
> under the liquidation provisions of the Illinois Community Currency Exchange
> Act did not fall under the regulatory power exception to the automatic stay in §
> 362(b)(4). *Id.* at 555. The court stated that the § 362(b)(4) exception applies "to
> the enforcement of state laws affecting health, welfare, morals and safety, but not
> to regulatory laws that directly conflict with the control of the res or property of
> the bankruptcy code." *Id.* (citation omitted). The court held that the State's
> liquidation proceeding did not fall within the ambit of § 362(b)(4) for two
> reasons: (1) because the liquidation proceedings under the Community Currency
> Exchange Act served only to protect the rights of creditors, not to enforce laws
> affecting health, welfare, morals, and safety, and (2) because the liquidation
> procedures "directly conflict with the control of property by the bankruptcy
> court."
>
> ...
>
> As noted in *Emerald Casino*, "the court [in *Cash Currency*] found that the State's
> interest was to protect the rights of other creditors, an interest that is not
> regulatory within the meaning of § 362(b)(4).... Therefore, the State could not

take control of the property when it did not have a valid regulatory interest."
*Emerald Casino*, 2003 WL 23147946, at *7.

The State in *Emerald Casino* was clearly pursuing a regulatory action.  It sought
to revoke the debtor's gaming license based upon the debtor's prior misconduct.
*Emerald Casino*, 2003 WL 23147946, at *8.  The State was concerned about the
debtor's possible commission of fraud and its connection to organized crime.  *Id.*,
at *2.  Revocation of the debtor's gaming license was necessary to prevent further
fraud, protect consumers and ensure the safety of casino patrons.  *Id.*[6]

By contrast, in this case, the State is not enforcing any laws intended to protect
the health, welfare, or safety of the public.  API had ceased conducting business
in February 2007, before it filed for bankruptcy.  The State filed its rehabilitation
proceeding to control the liquidation of API's assets, not to enforce any particular
violation of the Act.  As in *Cash Currency*, the State's actions here are solely for
the benefit of API's creditors.  Because the State is not acting in its regulatory
capacity, the regulatory and police power exception to the automatic stay in §
362(b)(4) does not apply.  Therefore, the regulatory power exception to the
automatic stay does not provide a basis for dismissing this case.

State's motion, Ex. B, at 35-36.

The State, as it did before the bankruptcy court, contends that *Cash Currency* was

overruled by the 1998 amendments to section 362(b)(4).  That argument too was squarely

addressed and rejected by the bankruptcy court:

The State argues that the 1998 amendments to § 362(b)(4) had the effect of
overruling *Cash Currency*.  Before 1998, the exception in § 362(b)(4) applied
only to actions stayed in § 362(a)(1) - "the commencement or continuation ... of a
judicial, administrative, or other action or proceeding against the debtor...."  11
U.S.C. § 362(a)(1).  In 1998, § 362(d)(4) was amended to apply to proceedings
stayed in § 362(a)(3) - "to obtain possession of property of the estate ... or to
exercise control over property of the estate."  11 U.S.C. [§] 362(a)(3).  *See in re
Emerald Casino*, 2003 WL 23147946, at *9.  This amendment expanded the
exception to allow states to pursue regulatory actions even if they conflict with
the bankruptcy court's control of property of the estate.  The State argues that this
amendment effectively overruled *Cash Currency* and that it may pursue its
liquidation of API as part of its regulatory power.

---

[6] The same facts were involved in *Village of Rosemont*, 482 F.3d at 936.

> The State's argument fails because the 1998 amendments to § 362(b)(4) only partially overruled *Cash Currency*. While state authorities are no longer prevented from taking regulatory action against property of the estate, the amendments did not affect the court's conclusion that liquidation proceedings designed to protect the rights of creditors are not regulatory actions that fall within this exception.[7]

State's motion, Ex. B, at 36-38. Thus, although the State may still pursue regulatory interests even if they conflict with the bankruptcy court's control over the estate, the court must still determine whether those interests actually are appropriately characterized as regulatory. In this case, there is no significant ground for disagreement regarding the bankruptcy court's conclusion that the State is not exercising its police or regulatory powers.

### D.    The propriety of striking the State's reply brief

The State contends in a footnote to its questions presented for appeal that "The Bankruptcy Court improperly struck Part IV of the Director's Reply in Support of Its Motion to Dismiss, which pointed out that one of the parties[] responding to the motion had raised the doctrine of abstention and that the Bankruptcy Court could dismiss on those grounds as well as the other grounds raised by the Director. If an appeal is granted, this decision to strike should also be reviewed." State's motion, at 5. Because leave to appeal will not be granted in this case, and because this issue does not clearly present a controlling and contestable issue of law (but

---

[7] That is to say, the amendments may have overruled the second basis for *Cash Currency*'s holding (that the liquidation procedures "directly conflict[ed] with the control of property by the bankruptcy court"), but not the first (that the liquidation proceedings under the Community Currency Exchange Act served only to protect the rights of creditors, not to enforce laws affecting health, welfare, morals, and safety). *Emerald Casino* expressly recognizes and relies on this distinction, 2003 WL 23147946, at *7, and cites *Cash Currency* as controlling authority for the necessity of determining the nature of the state's interest. *Id.* The State's argument that *Emerald Casino* recognized that *Cash Currency* has been completely overruled is therefore not persuasive.

instead a matter within the bankruptcy court's discretion), the court's decision cannot be reviewed further at this time.[8]


IV.    **Conclusion and Order**

For the foregoing reasons, the State of Illinois's motions for leave to appeal the orders of the bankruptcy court [#1 in case no. 07-C-3750 and #1 in case no. 07-C-4152] are denied. These cases are terminated.

DATED: October 23, 2007                    ENTER: _____

                                             JOAN HUMPHREY LEFKOW
                                             UNITED STATES DISTRICT JUDGE

---

[8]Any other arguments that were raised by the State but not discussed in this opinion have been considered and found not to be persuasive.